## GRIFFIN *v.* EUSTICE.

### Opinion delivered October 29, 1923.

1. MINES AND MINERALS—METHODS OF MINING COAL.—Under a lease of coal lands providing that the lessee should open up all mines on the lands according to the most modern and approved method of coal mining, the lessee could abandon the shaft method and adopt any other method of mining, so long as such mining was according to the most modern and approved method of coal mining.

2. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING.— Where evidence is so conflicting that the preponderance cannot be determined, the chancellor's findings will be adopted.

Appeal from Johnson Chancery Court; *W. E. Atkinson,* Chancellor; affirmed.

*Hugh Basham* and *Webb Covington,* for appellant.

Appellees wilfully and recklessly destroyed the mine, dismantled the tipple and removed machinery, in violation of the agreement. The case made here is much stronger than the one at 86 Ark. 489. Appellant was clearly entitled to the relief he sought, that is, the protection of all equitable rights and damages sustained by wrongful acts of appellees in wrecking and abandoning the mine, under the doctrine announced in 150 Ark. 169.

*Patterson & Ragon,* for appellee.

The right to mine involves the right to penetrate the surface of the soil for minerals and remove them in the manner most advantageous, using modern methods in performing the work. Barrington & Adams, Law of Mines, par. 177. Stripping is mining, and the kind most practical in the territory involved. A court of equity will not interfere on behalf of the party entitled thereto, and enforce a forfeiture, but will leave the party to his legal remedies, if any, even though the case might be one in which no equitable relief would be given to the defaulting party against the forfeiture. Pom. Eq. (3rd ed.) vol. 1, par. 459; 93 Ind. 456, 57 A. 1075; 81 S. W. (Mo.) 169; 69 N. W. 157; 111 Fed. 284; 53 N. J. Eq. 46. The case at 86 Ark. 489 is not like the present.

WOOD, J. This is an action by the appellants against the appellees to declare a certain lease forfeited and to recover damages alleged to have been sustained by the appellants by reason of alleged wrongful acts of the appellees in destroying a certain coal mine and in dismantling the tipple, removing the machinery from the mine, in violation of the terms of the original lease under which the appellees hold as sub-lessees. The appellants sold a certain tract of land in Johnson County, reserving in their deed the coal underlying the tract and the right to mine and remove the same. On the 29th of May, 1918, appellants leased the coal and the right to mine the same to appellee, Elizabeth Eustice. She sank a shaft, as by the terms of her lease she was required to do, and proceeded to develop the mine. The shaft was about 34 feet deep. Mrs. Eustice assigned her lease to the North Spadra Coal Company, one of the appellees. It operated the mine under its lease for about two and a-half years. The development work done by the coal company consisted in running an entry in a westerly direction for a distance of about 500 feet, from which entry rooms were turned off and driven north toward the crop line. A slope was driven south and southwest and rooms turned. In the fall of 1920 the coal company sublet the mine to appellees, Werner & Dunlap. The equipment at the time Werner & Dunlap took over the property under their lease consisted of tipple, breakers, scales, boiler and engine-room, pit-cars and such other machinery, tools and appliances as were necessary to the successful operation of the mine. The lease from the coal company contained a provision giving the sublessees, Werner & Dunlap, the right to strip and remove the coal under the lands for such period of time as the lessees were able to operate the mine in such manner as to derive a profit of at least one dollar per ton for the coal mined or stripped therefrom. The lease was made subject to prior leases, among them the lease from appellants to Elizabeth Eustice, which leases were made

a part of the lease contract from the coal company to Werner & Dunlap.

The original lease from appellant and wife to Elizabeth Eustice leased the property to Mrs. Eustice for a period of fifteen years, and if, at the end of that period, the provisions of the lease had been complied with, the lessee had the right to renew the same for an additional period of fifteen years, "for the purpose of mining the coal lying under the land and removing the same." It was provided that the lessee should begin at once sinking a shaft and opening and developing a mine on said property, and that she should diligently prosecute such work until a mine is properly opened and in operation. The lessee was to pay 12½ cts. per ton. She was to pay $100 the first year as a minimum royalty, $150 the second year, and $250 the third year and each year thereafter. It was provided that the lessee should open all the mines according to the most modern and approved methods of coal mining, and at all times keep and maintain the same in good condition for safe mining and so as to pursue the mining of coal under said lands within said mines with entire safety and economy. The lease further provided that the lessee or his assigns, when the lease was terminated, should deliver the mines in good working condition and leave the tracks and tracking and the pumps and shafts and air-shafts and all the houses connected with the mines, and air-course and entrance, in good condition. The forfeiture clause was as follows: "A failure of the second party or assignee hereof to pay the royalty on the coal mined for three months, or to pay the minimum royalty agreed upon, or should the second party, for any cause, cease to operate said mine or mines for a period of six months, then this lease shall, except in cases of strikes or unavoidable accident, upon written notice from party of the first part, his heirs or assigns, become forfeited at once, and all rights of the second parties hereunder cease, and the mine and property leased revert to the party of the first part, his heirs or assigns."

There is a further provision that, in case the mine was not operated for one year or for one coal season, so as to produce the tonnage as specified, and in case the minimum royalty was not paid for any one year as specified, then the lease should forfeit, without notice to the lessee. There was also a provision that, if the lessee failed to pay the royalty on the coal mine for three months, or to pay the minimum royalty agreed upon, or for any cause cease to operate the mine or mines for a period of six months, except for strikes or unavoidable accident, then, upon written notice to the lessee or his assigns, the lease shall be forfeited. The minimum royalty was to be paid quarterly. There is a further provision in the lease that, in case of forfeiture, or at the termination of the lease, if all mineable coal had not been removed from the lands, the lessor should have the exclusive right to use and occupy all surface lands bought or leased by the lessee, or his assigns, also all surface tracking and track used in stocking coal, until the lessor or his assigns had mined the coal from the lands, provided the same was done within thirty years from date. For the use of these surface privileges and rights, the lessor was to pay the lessee or his assigns the sum of $10 per ton.

The appellants, in their complaint, set out the provisions of the above lease to Mrs. Eustice, and alleged that, by the terms of the lease under which the appellees claimed, the Eustice lease was made a part of their lease contract, and set up that the appellees had wholly failed to comply with the provisions of the lease and had thereby forfeited all rights thereunder. They specifically alleged that the appellees had not opened up and developed the mine according to modern and approved methods; that they had pretended to open for the past coal season so as to produce the minimum royalty called for in the lease; that they had ceased to work the mine they had opened, and wholly abandoned the same; had removed the machinery and pumps, and torn

down part of the tipple; also, had torn down the pillars and removed the machinery and equipment; had torn down and destroyed the tipple and abandoned the mine, and permitted it to fill with water. That, if they had carried out their contract and mined the coal which cannot now be mined, appellants would have received a net profit from the mining of such coal in the sum of $1,500; that, by reason of the destruction of the mine and depriving the appellants of the use thereof, they had damaged appellants in the sum of $10,000; and that, by failure to pay the royalties, they had damaged appellants in the sum of $500; that appellants' aggregate damages by reason of the failure of the appellees to comply with their lease contract was $12,000, for which they prayed judgment.

The appellees categorically denied all the material allegations of the complaint concerning their failure to carry out the provisions of the lease. They alleged that they had continuously operated the mine to the satisfaction of the appellants. They averred that they endeavored to operate the mine by the sinking of a shaft and taking the coal from underneath the surface, but learned from experience and observation that the mine could be more profitably operated by stripping the surface and removing the coal in that way; that, by consent and with the full approval of the appellants, the appellees undertook to experiment and test the method of removing coal in this way, and, after having trouble about getting permission to remove the surface, which at that time was owned by R. H. Morrison and not by the appellants, the appellants offered their services to adjust and remove the surface troubles, and agreed that the appellees should take the coal out by stripping instead of through the shaft. They averred that the taking of the coal by the stripping method yielded thirty per cent. more royalty to the appellants than by the shaft method. They set forth that the appellant Griffin, about October 1, 1920, realizing the advantages

to appellants by mining the coal through the stripping method, went into the mine and instructed the mining foreman, who was then mining coal under a contract with the appellees, to what extent he should pull the pillars and roof supports in order to facilitate the mining of coal by the stripping method when such method was begun. They alleged that, after they began mining by the stripping method, appellants' royalties greatly increased to such an extent that they received more royalties in one month than they had received before for a whole year. They further set up that the deep coal underneath the land in controversy had a slate parting from four to six feet in thickness which made the mining by shaft prohibitive; that the mineable coal on the land ranged in depth from twenty-one to eight feet from the surface, and that it was not practical to mine the same through a shaft. They also averred that they were then mining the coal according to the best methods which were accepted and approved by the appellants, and that the real purpose of appellants in seeking to have the lease forfeited was, not because of any objections to the methods pursued by the appellees in mining the coal, but solely for the purpose of depriving their immediate lessor, Mrs. Eustice, of the royalties due her under her contract with the appellees.

The above are the material issues raised by the pleadings and the provisions of the written leases. After hearing the evidence adduced by the respective parties to sustain their contentions, the chancery court entered a decree in favor of the appellees, from which is this appeal.

The appellants contend that, under the terms of the original lease from appellants to Mrs. Elizabeth Eustice, the appellees were not authorized to pull the pillars in the shaft mine, drag down the air-courses, pull the irons, cut the cables to the cages, strip the tipple, remove all machinery, tools and appliances, permit the mine to cave in and fill with water, and, in fact, to destroy the

mine. We thoroughly agree with the appellants in the contention that the appellees, under the terms of the original lease, which is made a part of the lease contract under which appellees hold, would not be authorized to do the things above enumerated if the doing of those things were tantamount to a destruction of the mine. The original lease contemplated that the lessee and her assigns should ''open up all mines placed on the lands according to the most modern and approved method of coal mining.'' While this lease provided that the lessee should at once begin the sinking of a shaft and open and develop the mine, there is no provision anywhere in the lease restricting the mining of coal on the lands in controversy to the shaft method. On the contrary, the lease, when considered as a whole, shows clearly that it was contemplated by the parties that the mines should be opened up and developed, as is expressed therein, ''according to the most modern and approved methods of coal mining.'' If the original lease had, in express terms, limited the lessee to mining coal by the shaft method, then, unquestionably, the appellees would have been compelled to pursue that method; but, in the absence of such limitation, the lessee had the right to proceed to mine the coal ''according to the most modern and approved methods.'' Barrington & Adams, Law of Mines, p. 177.

The testimony of appellant Griffin tended to sustain the allegations of appellants' complaint that appellees had torn all the props and pillars down in the mine; that the mine was full of water, and that they had removed part of the tipple, the pump, scales, motor and machinery, and that it had been twelve months since they had operated the mine; that they had not paid the royalties according to contract, and that appellants had complied with the contract on their part in notifying the appellees that the lease was forfeited. Appellant Griffin testified that he had not in any manner consented to the acts complained of. They had abandoned the

mine without his permission. He conceded that he gave
his consent for the lessees to pull some pillars next to
the crop line north of the main entry, going west. This
was given on the representation of the lessees that the
pulling of such pillars would not interfere with the
workings in other parts of the mine, and upon the fur-
ther representation that, unless these pillars were
pulled, it could never be mined. He told the appellees
that he wouldn't give permission to do anything that
would destroy the mine or any part of the mine, or
interfere with getting out of coal, but told them that
they could remove the props next to the crop line where
it was caving in and covering the track, if it didn't
injure the mine. Griffin stated that he was a farmer,
ignorant of mining, and he informed appellees of that
fact, and, when they showed him where it was caving
and informed him that it was necessary to remove cer-
tain props and supports, he told appellees that he didn't
see anything wrong in moving the track and pulling the
pillars where it was caving; that Esch, the mining fore-
man of the appellees, informed the appellant that all
the track could be used on the other side of the mine
where there was other coal.

There was testimony on behalf of the appellants to
the effect that the appellees had a contract with Esch
to put coal on top of the mine at $4 per ton, and that
this contract provided for the pulling of pillars and
stumps in the mine; that Esch's contract was to expire
in six months, and didn't state anything except that
Esch was to pull pillars. The contract was to enable
Esch to get all coal to the surface possible by pulling
the pillars and stumps; that Esch began pulling the
pillars under his contract about October 15, 1920, and
that in January, 1921, nearly all the pillars had been
pulled in the entry up to where the slope turns south,
and that he had pulled them on either side of the slope.

The testimony of the appellees and their witnesses,
on the other hand, was to the effect that the roof in the

mine which the appellees were developing by the shaft method was bad—caving in and dangerous; that the appellant consented to the pulling of the pillars, and that appellant had gone into the mine, observed the condition of the entries, the slopes and rooms, and knew that the roof was caving; that he expressly consented that the appellees should pull the pillars and move the tracks, and expressly consented that they should adopt the method of stripping the mine, as that would produce far more coal and therefore be more advantageous to him.

There is a vast volume of testimony adduced along this line on the part of the appellees, tending to prove that the appellants had fully consented, with full knowledge of all the facts, to all that the appellees had done; that they were fully cognizant of the conditions of the mine, and knew that appellees were going to abandon the shaft method and resort to the stripping method. Certainly, if the appellants consented to the doing by the appellees of all those acts of which they herein complain, and for the purpose of enabling the appellees to work and develop the mine according to the most approved method of mining, under the conditions shown to exist in the mine in controversy, and for the purpose of making the mine more productive, then they would be estopped from claiming damages on account of such acts.

It could serve no useful purpose to discuss in detail all of this testimony. After carefully considering it, we have reached the conclusion that the findings of the chancellor are not clearly against the preponderance of the evidence. Indeed, this is one of those cases where it is most difficult for this court, in view of the great conflicts in the testimony, to determine just where the preponderance lies. In such cases it is the invariable rule to treat the findings of the chancery court as persuasive and adopt them as our own. *Morrow* v. *Mer-*

*rick,* 157 Ark. 618; *Leach* v. *Smith,* 130 Ark. 465-470, and cases there cited. That doctrine is peculiarly applicable to the facts of this record. The decree is therefore correct, and it is in all things affirmed.